**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DELORES WILLIAMS | |
| PLAINTIFF, | CV 04-3437(AKH) |
| **-AGAINST-** | Response |
| | To |
| CONSOLIDATED EDISON | Motion |
| | To |
| DEFENDANTS. | Dismiss |
| | Pursuant to |
| | Rule 56 |
| | of the |
| | Federal Rules |
| | Of Civil Procedure |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEPHEN T. MITCHELL, P.C.
Stephen T. Mitchell
*Attorney for the Plaintiffs*
67 Wall Street suite 2211
New York, NY 10005

212 587-1932

1

### A. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is not appropriate for this case.  The defendants are asking this court to ignore numerous issues of fact that have been raised by the evidence presented in this case.  Their applications for a  summary dismissal for all of the claims in this case should be denied.

A moving party is entitled to summary judgment if the court determines that no genuine issue of material fact exists to be tried.  If there is no genuine issue of material fact then the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); see also Celotex v. Catrett, 477 U.S. 317, 322-323 (1986); see also Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001).*  A fact is material if it might affect the outcome of the suit under governing law.  A fact is genuine if the evidence is such that a reasonable jury could return a verdict for the moving party. *Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).*  The burden is on the moving party to establish the absence of any material fact issues. *Celotex  at 325.*

The court's inquiry for a summary judgment motion is whether or not a reasonable juror could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 252 (1986).*  The non-moving party to a summary judgment motion is entitled to the resolve of all inferences and ambiguities in their favor. *Anderson at 255; Byrnie at 101.*  Thus if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party summary judgment is improper. *Howley*

*v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000).  However, even when the facts are disputed the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor. *Byrnie at 101*.

The district courts have been cautioned very strongly against granting summary judgment when the employers' motive and intent are at issue. *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir. 1994); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).

The United States Court of Appeals for the Second Circuit also has warned that when determining the appropriateness of a summary judgment motion the district court should not review the record in piecemeal fashion when assessing both hostile work environment and retaliation claims.  All of the circumstances of the work environment should be examined in order to assess the validity of either type of claim. *Burlington Northern & Santa Fe Railway v. White*, 126 S.Ct. 2405, 2417 (2006); Howley at 151; Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001); Schwapp at 111-112; Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000); Richardson v. New York State Dep't of Correctional Service, 180 F.3d 426 at 438-439 (2d Cir. 1999).

At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of the employer. *Byrnie at 102*.  A motion for summary judgment may be defeated where "a plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Id.; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000).* In this case there is a substantial body of evidence that supports the conclusion that the defendants' justifications are false. Summary judgment is not appropriate for this case.

### B. THE STANDARDS GOVERNING
### CLAIMS OF UNLAWFUL RETALIATION

Both Title VII and 42 U.S.C. §1981 make it unlawful for an employer to retaliate against an employee because they have made a charge of discrimination or acted in a manner to assist in the prosecution of charges of discrimination made by themselves or others. *42 U.S.C. 2000e-3(a); see also Raniola v. Bratton, 243 F.3d 610, 623 (2d Cir. 2001); see also Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988).* The standard used to assess the viability of a retaliation claim pursuant to Title VII are the same for a claim that has been made pursuant to 42 U.S.C. §1981. *See Taitt at 777.*

There is a three step process required to be followed in order to defeat a motion for summary judgment for a retaliation claim pursuant to Title VII. *See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-770 (2d Cir. 1998).* First, the plaintiff must make out a prima facie case of retaliation. Second, the defendant has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. Finally, if the defendant meets its burden then the plaintiff must adduce evidence sufficient to raise an issue of

fact as to whether or not the employer's proffered reasons for their employment action merely was a pretext for unlawful retaliation. *Id.*

In order to establish a prima facie case of retaliation the plaintiff must show (1) participation in a protected activity that is known to the defendant (2) an employment decision or action disadvantaging the plaintiff and (3) a causal connection between the protected activity and the adverse employment decision. *Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998); see also Richardson v. New York State Department of Correctional Service, 180 F.3d 426, 443 (2d Cir. 1999).*

First, the plaintiff must be able to establish that they engaged in a protected activity before a retaliation claim can be established. Federal anti-discrimination laws protect employees in filing formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges. *Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir. 2000); see also Raniola at 624-625.*

An employee is privileged to report and protest work place discrimination whether that discrimination is actual or reasonably perceived. *Matima at 78 (2d Cir. 2000).* The plaintiff need not establish that the conduct they opposed was an actual violation of Title VII. They only need to establish that they had a good faith belief that the provisions of Title VII were violated. *Raniola at 623.*

The second prong needed to establish a prima facie case of unlawful retaliation is for the plaintiff to establish that the employer's decision or action disadvantaged the plaintiff.  A plaintiff may suffer from an employment decision or action disadvantaging the plaintiff that is sufficient enough to satisfy the second prong of a prima facie retaliation case by enduring a materially adverse change in the terms and conditions of employment. *Richardson at 446*.   The United States Supreme Court has determined that in order to support a retaliation claim a plaintiff must demonstrate that an adverse employment action must be one in which might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern at 2415*.

The United States Court of Appeals for the Second Circuit has recognized that adverse employment actions may include terminations, refusals to hire, refusals to promote, demotions, reductions in pay, and reprimands. *See Reed v. A.W. Lawrence, 95 F.3d 1170, 1181 (2d Cir. 1996); see also Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-770 (2d Cir. 1998); see also Raniola v. Bratton, 243 F.3d 610, 624-625 (2d Cir. 2001); see also  Lovejoy-Wilson v. Noco Motor Fuel Inc., 263 F.3d 208, 223-224 (2d Cir. 2001); see also Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)*.   Other examples of materially adverse changes in employment include a loss of liberal sick leave and vacation, diminished job prestige, and a loss of favorable performance evaluations after consistently receiving favorable reviews. *See Gallagher at 349-350*.

The United States Court of Appeals for the Second Circuit also has recognized that Title VII does not limit its definition of adverse employment actions solely in terms

of job termination or reduced wages and benefits. *Richardson at 446*. Unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute an adverse employment action sufficient enough to satisfy the second prong of retaliation in order to establish a prima facie case. *Id*. An employee also may suffer a materially adverse change in the terms and conditions of her employment if her employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers. *Id*.

> "Just as an employer will be liable in negligence or a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action, so too will an employer be held accountable for retaliatory co-worker harassment to occur if it knows about that harassment but fails to stop it**."**

*Id*.

The third prong necessary to defeat a summary dismissal of a retaliation claim is to establish a causal relationship between the engagement in a protected activity and the adverse employment decision or action. Proof of causation may be established (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct or (2) directly, by means of retaliatory animus directed against the plaintiff by the defendant. *See DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993); Gordon v. City of New York, 232 F.3d 111, 117 (2d Cir. 2000)*.

A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action. *DeCintio at 115; Cosgrove at 1039; Raniola at 625*. A Title VII violation may be established notwithstanding the existence of other valid objective reasons for disciplining or terminating an employee when an employer is motivated by retaliatory animus. Even if there were no dispute as to the impropriety of the plaintiff's conduct, the evidence of retaliatory animus on the part of the employer would suffice to defeat the summary judgment motion. *See DeCintio at 115; Cosgrove at 1039; Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1177-1178 (2d Cir. 1996); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65-66 (2d Cir. 1998); Raniola at 625*.

A plaintiff may prove that retaliation was a substantial or motivating factor behind an adverse action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in the same conduct; or (2) directly through evidence of retaliatory animus directed against the plaintiff by the defendant. *Raniola at 625; Gordon at 117*.

## C. THE STANDARDS GOVERNING
## CLAIMS OF HOSTILE ENVIRONMENT

In order to prevail on a claim of racial or sexual discrimination caused by a racially or sexually hostile environment the plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive enough to alter the terms and conditions of the victim's employment and create

an abusive working environment. *Howley v. Town of Stratford, 217 F.3d 141, 153-154 (2d Cir. 2000).*

The plaintiff must demonstrate that either a single incident was extraordinarily severe or that a series of incidents were sufficiently contiguous and concerted to have altered the terms and conditions of the workplace. *Id*. A fact finder must determine whether or not a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse. *Richardson at 436-438.*

In order to assess whether or not a work environment has reached certain qualitative levels that is sufficiently severe or pervasive as to alter the terms and conditions of the victim's employment the trier of fact must determine the existence of the racial or sexual harassment in light of the record as a whole and the totality of the circumstances. *Raniola at 617.*  An examination of the culture of the workplace may be critical to the assessment of a hostile work environment claim. *Mandell at 378-379.*  The purpose of the inquiry is to obtain a realistic picture of the work environment. *Raniola at 617.*  Thus where individual instances of unlawful harassment on their own do not create a hostile environment, the accumulated effect of such incidents may result in an unlawful hostile environment. *Id.*

Pervasive retaliatory misconduct also supports a claim of hostile environment. *See Terry v. Ashcroft, 336 F.3d 128, 149-150 (2d Cir. 2003).*  Further, hostile work

environment claims and retaliation claims may overlap in certain circumstances because one condition may exacerbate the other. *Id. at 150.*

### D. THE PLAINTIFF

The plaintiff in this case is Delores Williams.  Ms. Williams is an African-American female who has been employed by the defendants since February 1995. *See Exhibit "D" at 12, 17.*

### E. HOSTILE WORK ENVIRONMENT CLAIMS

Ms. Williams has claims against the defendants because they maintained a racially and sexually hostile environment. Her federal racial discrimination claims for hostile environment are viable from May 5, 2000.  Her New York State and New York City claims for racial and sexual hostile environment are viable from May 5, 2001.  Her federal sexual discrimination claims are viable from February 1, 2004.  The plaintiff claims that she has been the victim of a continuous racially and sexually hostile environment since May of 2000 and asserts to use these claims as evidence in support of her claims that are not time barred. *United Airlines, Inc. v. Evans, 431 U.S. 553, 578 (1977).*

The defendants' primary defense is to seek to have this court examine the plaintiff's hostile work environment claims in piecemeal fashion.  The United States Court of Appeals for the Second Circuit expressly has prohibited a review of hostile environment claims in piecemeal fashion. The totalities of the circumstances are

supposed to be reviewed by the district court in order to assess the legal sufficiency of a hostile work environment claim. *See Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001); Cruz v. Coach Stores, 202 F.3d 560, 570 (2d Cir. 2000).* Below the plaintiff lists the circumstances that comprise her hostile environment claims in opposition to the defendants' summary judgment application.

## A. Exclusion from the General Utilities Position.

In November 1999 Ms. Williams sought to change positions in Con Edison. She applied to become a General Utilities Worker. *See Exhibit "D" at 40.* Ms. Williams filed an application for this position and waited a year for a response to her application. She did not receive a response to her application for one year. *Id. at 40-42.*

Ms. Williams filed a grievance with her union and subsequent to filing her grievance a complaint with the NLRB after waiting a year for a response to her application. She alleged in her complaints that she was not being treated fairly. *Id. at 40-41.*

## B. Exclusion from the Queens flush.

In 2001 an arbitrator awarded Ms. Williams a Mechanic "B" title and seniority retroactive to 1999 based upon her complaints. *Id.* She actively began seeking a position with the Queens flush truck unit. This job primarily entailed the operation of a flush truck that was used to clean and maintain the company's underground equipment. *Id. at 27-30.*

Ms. Williams was denied the opportunity to work in the Queens flush unit because she was a woman.  The manager of the Queens flush unit, Randy Walter, told her that that she would not be hired into the unit because women never would be welcomed into that department.  *See Exhibit "D" at 28-31, 36*.  Ms. Williams complained about being excluded from the Queens flush to the chairman of the company, Eugene McGrath.  *Id. at 30*.  The defendants' response to Ms. Williams' complaints about being excluded from the Queens flush department was not to address the illegal exclusionary practice; the company assigned her to the Brooklyn flush instead. *Id. at 31*.

<u>C. The assignment to a contaminated locker room.</u>

Ms. Williams began working in the Brooklyn flush in April or May of 2001.  *Id. at 37*.  Three women were assigned to the Brooklyn flush in 2001.  They included Ms. Williams, Susan Kartell, and Jackie Howe. *Id. at 47*.  When the women arrived they did not have changing facilities in the department but the men did. *See Exhibit "T" the deposition of Robert Tomasichio at 71*.  The women had to change in an open garage area, a converted bathroom, or a truck while the men had indoor locker room facilities. *Exhibit "D" at 176-179; see Exhibit "T" at 72*.  The women were treated differently because in every facility in Con Edison a locker room was a locker room and a athroom was a bathroom. *Exhibit "T" at 72*.

Shortly after Ms. Williams was assigned to the Brooklyn flush she complained to her supervisor, Walter Alverado, about the lack of availability of changing facilities for

the women assigned to the department and the inequity of this circumstance compared to the facilities the men had. *Exhibit "D" at 180-181*.

Sometime after May 5, 2001 Ms. Williams was assigned to a locker room that was contaminated with poisonous mushrooms, rat feces, and asbestos in response to her request to have a place to change her clothing. *Id. at 181; see also Exhibits "A", "B", "C", "E", and "W"*. The assignment to this locker room was one of the first significant actions taken on her behalf by a supervisor after she began working for the Brooklyn flush. The locker room that she was assigned to was filthy and contained numerous photos of nude women strewed throughout the room. *See Exhibit "D" at 181*.

Ms. Williams was assigned to this locker room by one of her supervisors, Celestino (Tino) Fernandez, after complaining to her supervisors about not having a place to change her clothes. *Id. at 181, 187*. She used the contaminated locker room for several months without knowing or being told by her supervisors that the room was contaminated. *Id. at 184, 188, 239-240; see also Exhibit "G"*. The conditions of the locker room Ms. Williams was assigned to were so deplorable that a Vice-President of the company told Ms. Williams that he was "embarrassed and disgusted for the sake of the company" because of conditions he observed. *Id. at 189*.

The managers and supervisors responsible for the safety of the employees working at the Brooklyn flush in 2001 were aware of the seriousness of the environmental hazards of the locker room Ms. Williams was assigned to as early as April

2001 at least one week before Ms. Williams was assigned to the locker room. *See Exhibit "R" the deposition of Edgar Cortes a company safety officer at 19-20.* The men assigned to the locker room before it was condemned had a lot of physical problems in the room with itching and allergies. *See Exhibit "X" the deposition of Eugene Williams at 20-21.* Mr. Fernandez assigned Ms. Williams to a contaminated locker in spite of the fact that he was aware of the serious health hazard the contaminants in the locker room posed to employees before he assigned her to the locker room. *Exhibits "A", "B", "C", "E","F"; see also Exhibit "T" at 66-69.* Mr. Fernandez had received correspondence from other Con Edison managers informing him of the health hazards associated with the locker room prior to assigning Ms. Williams to the facility. *See Exhibit "B" and "C".* Mr. Alverado and other Con Edison managers and supervisors responsible for the safety and well being of all Brooklyn flush employees also were aware that the locker room Mr. Fernandez assigned Ms. Williams to change her clothes in posed a serious health hazard for employees before she was assigned there. *Exhibits "A", "B", "C", "E", "F"; see also Exhibit "R" at 7, 17, 19-22, 31-32.* Supervisors knew Ms. Williams was assigned to the locker room after it was determined that it was contaminated. *Exhibit "X" at 22.*

Ms. Williams was removed from the locker room several months after Mr. Fernandez assigned her to the facility after a vice-president, Mr. Torchia, inspected the facilities, was shocked, and called in a hygienist. *See Exhibit "D" at 189-190.* Ms. Williams was exposed to the contaminants in the locker room for several months before she was informed of the potential health hazards she unnecessarily was exposed to. *See Exhibit "G".*

Ms. Williams should have been offered the opportunity to file an exposure report after she was exposed to the hazardous materials. *Exhibit "R" at 32-34; see also Exhibit "G"*. Ms. Williams never was given the opportunity to file an exposure report in spite of the fact that the company was aware that she was having a physical reaction to the exposure to the toxins. *See Exhibit "D" at 190-195*.

These facts are a part of both the plaintiff's hostile work environment charge and her retaliation charge. There are occasions when both can overlap and one can exacerbate the other. *Terry v. Ashcroft, 336 F.3d 128, 150 (2d Cir. 2003)*. A reasonable juror could believe that her assignment to a toxic facility was an adverse employment action. A reasonable juror also could believe that Ms. Williams was placed in the contaminated locker room in reaction to her complaints about the inequities of the changing facilities that were available in the department for the men and the women. These complaints were a protected activity. The time frame between her complaint of the inequity and her assignment to the contaminated locker room was a few days. *See Exhibit "D" at 180-181*.

Ms. Williams can maintain a viable hostile environment claim because a reasonable juror could consider Mr. Fernandez's knowing assignment of her to a toxic facility to be retaliatory and sufficiently outrageous, mean spirited, humiliating, and physically threatening (Ms. Williams' health was threatened by the exposure) to support such a claim.

The plaintiff claims that the assignment to the contaminated locker room is evidence of both a racially and sexually hostile environment.  Plaintiff considers the assignment to be sexually hostile because it took place in response to her complaints of the absence of changing facilities for women in the department.

She also claims that the assignment to the contaminated locker room was racially hostile because Mr. Fernandez was one of the supervisors who declined to assign the plaintiff to work with non-African-American male personnel upon their request for several years beginning with Ms. Williams' May 2001 assignment to the department. *See Exhibit "T" at 10-15, 25; see also Exhibit "D" at 86-88; see also Exhibit "W" at ¶¶4-7.* Mr. Fernandez had referred to Ms. Williams as a real bitch in the presence of supervisors on more than one occasion. *See Exhibit "X" at 13-14.* Mr. Fernandez's misconduct evinces a racially inspired animosity directed towards Ms. Williams from the onset of her employment in the department before he reasonably could have been aware of her work habits or capabilities.  A reasonable person could conclude that racial animosity towards Ms. Williams impacted Mr. Fernandez's decision to assign her to a contaminated facility.

### D. Several men refused to work with Ms. Williams in violation of company rules.

Ms. Williams' assignment to the Brooklyn flush was not well received by several of the non-African-American men who worked in the department. Several of her non-African-American male co-workers and supervisors concocted a plan to allow some of her non-African-American male co-workers to avoid being partnered with her for work assignments in spite of company rules that prohibited this behavior. *See Exhibit "K" at*

*¶32*. Supervisors and non-African-American co-workers agreed among themselves to adhere to an assignment system in which several non-African-American male co-workers would not be assigned to work with Ms. Williams or another African-American female Jackie Howe. *See Exhibit "O" at ¶3 (Lichtenstein comments).*  They did not want to work with African-American women. *See Exhibit "T" at 10-15, 25; see also Exhibit "D" at 86-88; see also Exhibit "W" at ¶¶4-14; see also Exhibit "H" the affidavit of Jacqueline Howe at ¶¶1-11; see also Exhibit "O" at ¶¶1-3 (Bankhead, Russo, Lichtenstein comments).*  The people identified who said they did not want to work with the African-American women included Delarosa, Quijije, Quest, Kernz, Hershkowitz, and Rosenking. *See Exhibit "T" at 11-12.*  The defendants' own records confirmed Ms. Tomasichio's deposition testimony.  The defendants admit that Quijije, Kernz, Quest, and Rosenking did not work with the plaintiff in 2001 or 2002 and that plaintiff did not work with Hershkowitz or Delarosa in 2002.  *Alverado Declaration Defendants' Exhibit "A" at 5; see also Exhibit "T" at 11-13.*  Mr. Hershkowitz and Mr. Quest referred to the women on a weekly basis as a bunch of cunts who did not belong in the department. *See Exhibit "T" at 16-18.*

The practice of exempting certain non-African-American employees from working with the African-American women began in 2001 and continued from that point until at least 2005. *See Exhibit "T" at 11-13, 61-62; see also Exhibit "W" at ¶¶4-14; see also Exhibit "H" at ¶¶1-11.*  Ms. Williams complained about being excluded from working with certain employees to her supervisors once or twice a month for at least three years before her concerns were addressed. *See Exhibit "W" at ¶8.*  The defendants

claim that Ms. Williams' concerns were addressed immediately but they have offered no evidence in support of this claim and Ms. Williams' deposition testimony does not support the defendants' claim.

Ms. Williams found the exclusions humiliating. She also found that the exclusions interfered with her ability to obtain overtime pay because she could not be placed on overtime if she did not have the appropriate partner. If a person scheduled for overtime refused to pair with her she could not work overtime. The exclusions limited the options she had for overtime work and to receive overtime compensation. *See Exhibit "W" at ¶10-12; see also Exhibit "O" at ¶2 (Tino and Russo comments).* The exclusions also denied her the opportunity to learn her job and develop her skills by working with a larger variety of people. Most of the job was on the job training and the flush workers obtained training from each other. *Id. at ¶13; see also Exhibit "K" at ¶¶22-31.*

The supervisors' refusal to partner Ms. Williams with a variety of people resulted in her partnering with Ms. Howe. *See Exhibit "T" at 25.* This meant that two inexperienced people were working together and they were at a disadvantage. One supervisor told a manager that partnering Ms. Williams and Ms. Howe was a bad idea because of their inexperience. The manager did not listen. *See Exhibit "X" at 6-8, 28-30; see also Exhibit "K" at ¶¶22-31.* Ms. Williams recognized this and that is why she insisted on being paired with an experienced person. *Exhibit "D" at 65-66.* Her request was denied. *Id.*

The supervisors were determined to keep the African-American women together because few men would work with them. *See Exhibit "D" at 66-67, 72-75*.  Several co-workers repeatedly told Ms. Williams that women did not belong in the job. *Id. at 66-67, 72*.  Ms. Williams heard her co-workers say, "nobody wants to work with those cunts and bitches.  I don't know why they brought them here." *See Exhibit "D" at 73*.  In another instance a co-worker referred to Ms. Williams as a cunt and a bitch in the presence of a supervisor. *Id. at 160-163*.  One supervisor heard two other supervisors, Dekanchek and Fernandez, refer to Ms. Williams as a real bitch on more than one occasion. See Exhibit *"X" at 13-14*.

Ms. Kartell had a significant advantage in training and supervision over Ms. Williams because Ms. Kartell was partnered with an experienced "A" mechanic.  The advantage was that the "A" mechanic knew how to repair the truck and equipment and was capable of teaching the junior person on the job. *See Exhibit "K" at ¶¶22-31, 35-38; see also Exhibit "D" at 74-76*.  Ms. Kartell's work with the "A" mechanic also helped her with preparation for the "A" mechanic's examination. *Exhibit "K" at ¶¶37-38*.  Ms. Williams did not receive the nurturing that Ms. Kartell received and could have used more to help her development. *See Exhibit "X at 6-8*.

Actions by co-workers and management that prevent an employee from receiving appropriate training for their work have been found to support a claim for hostile work environment. *Feingold v. New York, 336 F.3d 138, 151 (2d Cir. 2004)*.

E. Ms. Williams and Ms. Howe's work efforts were sabotaged on a regular basis.

Members of the Brooklyn flush regularly sabotaged the truck and equipment Ms. Howe and Ms. Williams used.  The African-American females were the only persons who worked in the Brooklyn flush who regularly had the electrical and hydraulic systems of their trucks tampered with.  The white female, Susan Kartell, did not have her truck or equipment tampered with. *See Exhibit "K" the affidavit of Susan Kartell at ¶29.*

Brooklyn flush employees thwarted Ms. Williams' efforts to be productive at work by altering the suction for the truck so that it would not work properly.  They would adjust the valves so that the water pressure would be ineffective.  They also would remove fuses so that the truck would not move or operate properly.  These interferences only were directed against the African-American females and they occurred on a weekly and bi-weekly basis for more than two years. *See Exhibit "D" at 171; see also Exhibit "W" at ¶¶16-25; see also Exhibit "H" at ¶¶12-20; see also Exhibit "K" at ¶29.*  The sabotage was so regular that both women always were concerned for their safety beyond what they could normally expect whenever they used their truck because they did not know what acts of sabotage they might be subjected to. *See Exhibit "W" at ¶23; see also Exhibit "H" at ¶19.*

Ms. Williams complained to her supervisors about the aforementioned acts of workplace sabotage and attributed the aforementioned misconduct to both racial and sexual discrimination when she complained.  The plaintiff complained about the aforementioned misconduct to her supervisors on a weekly and bi-weekly basis for two

years.  Her complaints fell on deaf ears and the sabotage continued on a regular basis unabated for two years in spite of the plaintiff's complaints to her supervisors. *See Exhibit "W" at ¶¶21- 25.*

Evidence of workplace sabotage is supportive of a hostile environment claim. *See Raniola v. Bratton, 243 F.3d 610, 619-620 (2d Cir. 2001).*  In this case there is evidence that the hostility directed to Ms. Williams was both sexually and racially inspired.

The fact that Ms. Williams' truck and equipment were sabotaged after she complained to her supervisors is supportive of a hostile environment claim.  The plaintiff's supervisors had a duty to abate the harassment that she complained of and the fact that it continued after she complained to her managers is evidence that calls into question the effectiveness of the management's efforts to stop a known hostile circumstance.  Reasonable jurors could conclude that Con Edison's managers were negligent with respect to handling Ms. Williams' circumstance. *See Whidbee v. Garzarelli Food Specialties, 223 F.3d 62, 72-73 (2d Cir. 2000).*

F. Ms. Williams was exposed to pornography on a regular basis while on the job.

Pornographic photos of nude women were left in conspicuous places for Ms. Williams and her female colleagues to find while on the job.  Ms. Williams frequently found nude photographs of women in the trucks she used, the contaminated locker room she was assigned to, and in conference rooms. *See Exhibit "D" at 162-169.*  Ms. Williams complained about this problem in 2002. *See Exhibit "I"; see also Exhibit "M";*

*see also Exhibit "N"; see also Exhibit "T" at 62-66.*  Ms. Williams complained through to 2004 about the same problem. *See Exhibit "J"; see also Exhibit "Y" the deposition of Yamis Thomas at 43-46.*  No serious efforts were made to try to stop the pornography from being displayed in the workplace for almost two years and the pornographic materials continued to be displayed after Ms. Williams complained. *Exhibit "D" at 169-175; see also Exhibit "T" at 62-66.*

Notwithstanding the company's efforts pornography still was displayed in Ms. Williams' workplace.  An e-mail was distributed warning of the consequences of displaying pornography at the workplace approximately two years after Ms. Williams complained. *See Exhibit "J".*  After the e-mail was distributed Ms. Williams was attacked personally.  A box of condoms and pornographic photos were placed among her work cloths shortly after the e-mail was distributed. *See Exhibit "D" at 172-175.*  In spite of her complaints the display of pornographic materials continued after she complained calling into question the effectiveness of the company's remedial efforts and highlighting the negligence manifest in the company's response. *Whidbee at 72-73.*

Ms. Williams did not report the last incident because she believed that her co-workers would retaliate against her as they had before and her efforts to combat the hostile work environment would prove to be futile. *Exhibit "D" at 173.*  At this point she need not report the incident in order to maintain viable retaliation and hostile environment claims because she had complained before and it appeared that her efforts

either would prove to be futile or could lead to further retaliation.  *See Snell v. Suffolk County, 782 F.2d 1094, 1104-1105 (2d Cir. 1986); see id. at note 13*.

### G. Ms. Williams was harassed by Rom Quijije.

Ms. Williams complained to her supervisor, Walter Alverado, for more than one year about a co-worker, Rom Quijije. *Exhibit "D" at 92-101; see also Exhibit "Y" the deposition of Yamis Thomas at 78-79*.  Mr. Quijije repeatedly sexually harassed Ms. Williams for months by regularly telling Ms. Williams and her co-workers that women did not belong in the department and that he did not want to work with women.  He also regularly referred to women as stupid. *See Exhibit "D" at 67-70, 92-101, 103-107, 145; see also Exhibit "T" at 15; see also Exhibit "Y" at 78-79*.

Ms. Williams complained for months to her supervisors about Mr. Quijije because his comments about women made her uncomfortable. *See Exhibit "D" at 92-93, 100-107*. The supervisors she complained to included Mr. Alverado and Mr. Salidino.  She also complained to the company EEO office. *Exhibit "Y" at 78-79*.  None of the supervisors or the EEO office responded to her complaints about Mr. Quijije and his misconduct continued after she complained to her supervisors. *Exhibit "D" at 94-101, 103-107; see also Exhibit "Y" at 78-79*.

Mr. Quijije was one of the non-African-American employees who were excused by the supervisors from working with the African-American women in spite of company rules to the contrary. *See Exhibit "K" at ¶32*. The defendants' own evidence shows that

Mr. Quijije never was paired to work with the plaintiff in 2001 or 2002. *Alverado Declaration Defendants' Exhibit "A" at 5; see also Exhibit "T" at 11-13; see also Exhibit "O" at ¶3 (Lichtenstein comments).*

Mr. Quijije's behavior and the behavior of his supervisors contributed to the plaintiff's racially and sexually hostile environment.  The nature of Mr. Quijije's behavior clearly was sexually harassing and it took place over a significant period of time.  The supervisors responsible for addressing Mr. Quijije's misconduct did not address her numerous complaints to them.

The reason why Con Edison is liable for a racially hostile environment is because there is evidence that, for a substantial period of time, the supervisors did not require Mr. Quijije to be paired with the African-American females in violation of the company's anti-discrimination policies.  Mr. Quijije and the supervisors' participation in this practice is evidence of racial animosity.

Con Edison also maintained a racially hostile environment because they ignored evidence that there were employees who refused to be paired with the African-American females in violation of the company's anti-discrimination policies.  Ms. Williams, Ms. Howe, Ms. Kartell, Mr. Tomasichio, and Mr. Lichtenstein all offered evidence that was available to Con Edison officials in 2002 that there was a practice by Con Edison supervisors of refusing to pair certain employees with African-American women. Ms. Williams complained about this practice and notwithstanding her complaints the

company performed an inadequate investigation that did not result in the discontinuation of the practice. *See Exhibit "M" and "N"; see also Richardson at 446; see also Whidbee at 72-73.*

### H. Ms. Williams was harassed by John Dekanchek.

The plaintiff has evidence that Con Edison supervisor, John Dekanchek, was a bigot who directed his animosity to African-American employees that he supervised. Mr. Tomasichio heard Mr. Dekanchek refer to African-American subordinates as, "nigger", more than once. *Exhibit "T" at 40-41.* Mr. Tomasichio also heard Mr. Dekanchek talk down to an African-American subordinate, assign him a humiliating task, and refer to him as "boy." *Id. at 42-45.*

Mr. Dekanchek racially and sexually harassed the plaintiff in many ways for several years. Mr. Dekanchek was one of the plaintiff's supervisors. He told employees that Ms. Williams was screwing another employee while on the job. *See Exhibit "P"; see also Exhibit "L"; see also Exhibit "D" at 132-133.* He also allowed one of his subordinates to call Ms. Williams a "cunt" in his presence. *Id. at 145.*

Ms. Williams complained for two years to Mr. Alverado about how Mr. Dekanchek would yell at her, talk down to her, and always speak harshly to her as opposed to other people he supervised to no avail. *Id. at 135, 149-152; see also Exhibit "W" at ¶26.* Mr. Dekanchek's verbal abuse of the plaintiff and her partner took place weekly for more than two years. *Id. at ¶31.* Ms. Williams expressly complained to Mr.

Alverado that she believed Mr. Dekanchek's mistreatment of her was racially inspired because she did not observe him treat any of the white employees as badly as he treated her and her partner. *See Exhibit "W" at ¶28; se also Exhibit "K" at ¶33.*  Mr. Alverado took no steps during the two years time Ms. Williams complained about Mr. Dekanchek to stop Mr. Decanchek's use of harsh language, yelling, and verbal abuse. *See Exhibit "W" at ¶30.*

Ms. Williams also testified that Mr. Dekanchek gave her and her partner, Ms. Howe, bad trucks and placed her in danger by kicking her equipment while it was in use. *Exhibit "D" at 135-136.*  Mr. Dekanchek also cursed the plaintiff and Ms. Howe so harshly that he was reprimanded for the misconduct. *See Exhibit "Y" at 18, 21-24, 36-38.* In contrast, Mr. Dekanchek treated Ms. Kartell, a white female co-worker of Ms. Williams, differently than he treated Ms. Williams.  He always was cordial to Ms. Kartell and never was cordial to Ms. Williams or Ms. Howe. *See Exhibit "K" at ¶33.*

### I. The complaints of other Con Edison employees.

Ms. Williams was not the only Con Edison employee of African descent who was retaliated against for complaining of racial discrimination to her supervisors and the company EEO office during the period of time she complained.  Matricia Moore and David Perez also complained to their supervisors and the company EEO office of racial discrimination and soon after they complained suffered significant adverse employment actions.  *See Exhibit "P" and "Q"; see also Taitt v. Chemical Bank. 849 F.2d 775, 778 (2d Cir. 1988).*  Ms. Moore, Mr. Perez, and Ms. Williams all wrote the chairman of the

company complaining of racial discrimination at some point in their careers.  All three of these individuals repeatedly complained to their supervisors and EEO representatives to no avail.

Susan Kartell will testify that in 2005 she was threatened with suspension and the possible loss of her job because she complained of being sexually harassed by a co-worker to her supervisor. *See Exhibit "K" ¶¶1-13*.   Ms. Kartell also will testify that she was sexually harassed by a co-worker for several months, complained about the harassment, and management did not stop the harassment, it continued. See *Exhibit "K" at ¶¶2-12*. Ms. Williams was aware of the threat because Ms. Kartell told her about the threat. *Id. at ¶13; see also Exhibit "W" at ¶32*.

The threat to Ms. Kartell and the company reaction to Ms. Moore and Mr. Perez's complaints are a part of the general work atmosphere for Ms. Williams and should be considered a part of the total circumstances of her hostile environment. *See Schwapp v. Town of Avon, 118 F.3d 106, 111-112 (2d Cir. 1997)*. Mr. Perez and Ms. Moore's circumstances are a part of Ms. Williams general work atmosphere because in all of the instances the company EEO office did not appropriately address the complaints of discrimination and adverse employment actions followed soon after the parties complained to the EEO office.  Ms. Williams was aware of both the Perez and Moore claims. *See Exhibit "W" at ¶33*.

J. Evidence of racially discriminatory preferences at Ms. Williams work site.

White co-workers of Ms. Williams did not get docked for lateness to the same extent that African-American employees did.  *Exhibit "T" at 79-80; see also Exhibit "K" at ¶¶17-20*.   Ms. Williams' supervisors also engaged in racially discriminatory assignment policies.  The supervisors generally sent African-American employees to high crime areas or Black neighborhoods and the white employees went to south Brooklyn to service the white neighborhoods. *Id. at 74-77.*  The defendants claim the a control center separate from the yard supervisors sets the assignments but the supervisors allow swapping of assignments and often change the assignments at the last moment. *See Exhibit "W" at ¶34; see also Exhibit "K" at ¶34.*

Ms. Kartell, a white female, will testify that for more than a year after she started at the Brooklyn flush she was not partnered with an African-American male for work assignments.  *See Exhibit "K" at ¶14.*

Ms. Williams was not provided the same opportunity as men junior to her to complete the education requirements for a "B" Mechanic title.  The men were able to go to school immediately and Ms. Williams had to wait when she should have gone before them. *Exhibit "T" at 58-61.*

The aforementioned matters serve as more than adequate evidence to support the plaintiff's hostile environment claims.  The defendants' motion for dismissal of these claims should be denied.

## F. RETALIATION AND DIFFERENTIAL TREATMENT CLAIMS

No reasonable person would dispute that assigning an employee to a toxic facility without their knowledge almost immediately after they complained of sex discrimination could dissuade such a person from protest in the future.  The assignment to the toxic locker room was retaliatory because it took place almost immediately after Ms. Williams complained about the inequities of the women's changing facilities and it was done by a person who was involved in a scheme to avoid assigning certain men to work with the African-American women contrary to company policy.

There is evidence to support Ms. Williams claim that Mr. Dekanchek's review of her performance was retaliatory. Mr. Dekanchek's preparation of the performance review took place on the heels of a complaint of racial and sexual discrimination filed by Ms. Williams against him. *See Exhibit "U" at 109-110; see also Exhibit "CC" at 75-76; see also Exhibit "D" at 218-219.*  Ms. Williams filed an EEO complaint against Mr. Dekanchek in July 2003 and the negative performance review was put forth in October 2003, approximately three months later. A three month period of time is well within the standard range of acceptance by federal courts for the requisite temporal proximity necessary to support an unlawful retaliation charge. *See Gorman-Bakos v. Cornell Coop Extension, 252 F.3d 545, 554 (2d Cir. 2001)(collecting cases ranging from two months to a year that establish temporal proximity).*

This court also should be mindful of the fact that the negative performance review took place after Ms. Williams repeatedly complained about Ms. Dekanchek's behavior towards her to Mr. Alverado for several months. *See Exhibit "W" at ¶¶28-31.*

There also is evidence that retaliatory animus may have influenced the opinions of Mr. Dekanchek.  Mr. Dekanchek was heard by another supervisor referring to Ms. Williams as a real bitch. *See Exhibit "X" at 13-14.* Mr. Dekanchek also used racially offensive remarks to describe African-American subordinates.  Even if there is no dispute as to the impropriety of the plaintiff's conduct, evidence of retaliatory animus on the part of the employer would suffice to defeat a summary judgment motion. *DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d cir. 1987); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d cir. 1993).*

Ms. Williams also was not provided with notice that she was performing poorly prior to the review by any of her supervisors. *See Exhibit "V" the 6/4/04 affidavit of Delores Williams at ¶¶12-13.*  Ms. Williams was entitled to such warnings and it was the practice of the supervisors in the Brooklyn flush during her tenure in the department to provide employees warnings of poor performance before a performance review so the employees could try to improve. *See Exhibit "K" at ¶39; see also Exhibit "W" at ¶35.* This departure from normal procedures is an indication of invidious motivation.  *Village of Arlington Heights, et al. v. Metropolitan Housing Development Corp., 429 U.S. 252, 267 (1977).*

A negative performance review is considered an adverse action particularly when the review closely follows a complaint of unlawful discrimination. *See Perez v. Consolidated Edison, 2006 U.S. Dist. LEXIS 67459  (S.D.N.Y. 2006)*. This court should deny the defendants' summary judgment application with respect to this claim.

Ms. Williams was accused of threatening the life of two of her supervisors, Mr. Alverado and Mr. Dekanchek during the last quarter of 2003.   In February 2004 suspended from work for five days, placed upon final warning, lost her merit pay, and lost the ability to apply for a promotion to an "A" mechanic because of discipline imposed by the company.

There is no dispute that at the time the discipline was imposed company was aware that Ms. Williams had engaged in a series of protected activities during the course of 2003.   Mr. Alverado acknowledged that Ms. Williams complained about Mr. Dekanchek, co-worker Quijije, and himself in 2003. The defendants do not dispute that in January 2003, July 2003, August 2003, and November 2003 Ms. Williams made complaints of discrimination to Con Edison's EEO office. *See page 2 of defendants 56.1 statement; see also Exhibit "Y" at 78-79; see also Exhibit "Z"*.   The November complaint was just three months before she was disciplined.   As noted above the discipline was temporally adjacent to Ms. Williams' complaints of unlawful discrimination.

There also is no dispute that Mr. Alverado was aware of several of the aforementioned complaints to the company EEO office by Ms. Williams that were made in 2003. *See Exhibit "AA" at page 2; see also Exhibit "CC" at 51, 53-54, 63, 80, 75-78. 102*. Ms. Williams also made complaints against Mr. Alverado in 2003 that included a complaint against him for race and sex discrimination and harassment in November 2003. *See Exhibit "W" at ¶¶35-36*. The complaints the plaintiff specifically made against Mr. Alverado were temporally close to the severe discipline imposed in November 2004.

The facts and circumstances surrounding the imposition of this discipline raise issues of fact that must be tried. There is no dispute that Ms. Williams denied all of the charges against her. *See Exhibit "AA" at 11*. There also is reason to disbelieve the accuser. The accuser had a severe crush on Ms. Williams and was rebuffed. He also took more than six months to report the alleged death threats. *See Exhibit "AA"*. Ms. Williams' denials and the lack of credibility attributed to Mr. Jones are issues of fact that should be presented to a jury. There is no dispute that Ms. Williams did not take steps to hurt anyone. Evidence that Mr. Jones may have been untruthful is a reason to deny summary judgment. *Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 147 (2d Cir. 2000)*.

The fact that Mr. Alverado was one of Ms. Williams' harassers also cuts against the issuance of summary judgment for this case. *See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-770 (2d Cir. 1998)*. Mr. Alverado actually sat in on the decision to discipline Ms. Williams and was a decision maker with regard to the extent of the

punishment and whether or not she was responsible for the acts accused of. *See Exhibit "BB" at 9.*  a reasonable juror might be suspicious of this arrangement and be prepared to opine that it lacks fairness and credibility.  Summary judgment should be denied with respect to this issue.

As noted above Ms. Williams was treated differently than her white female co-worker Susan Kartell.  Ms. Kartell was advantaged because she was paired with an experienced person and the two African-American women were not. *See Exhibit "X" at 28-30; see also Exhibit "K" at ¶¶22-31; see also Exhibit "D" at 65-66.*  Ms. Williams never got the chance to learn soda blasting or rodding.  These were tasks that could have resulted in her receiving overtime and no one was willing to train her or see that she received the training. *See Exhibit "W" at ¶¶37-38.*  Susan Kartell learned soda blasting because she was partnered with an "A" mechanic. *See Exhibit "K" at ¶¶35-36.*

For all of the aforementioned reasons the defendants' applications for the dismissal of the plaintiff's retaliation and differential treatment claims should be denied.

November 15, 2006

Stephen T. Mitchell
*Attorney for the Plaintiff*